**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| ZACHARY WHITED, | CASE NO. 5:24-CV-02199-PAB |
| Plaintiff, | |
| | DISTRICT JUDGE PAMELA A. BARKER |
| vs. | |
| COMMISSIONER OF SOCIAL SECURITY, | MAGISTRATE JUDGE AMANDA M. KNAPP |
| Defendant. | **REPORT AND RECOMMENDATION** |

Plaintiff Zachary Whited ("Plaintiff" or "Mr. Whited") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Child's Insurance Benefits ("CIB")[1] and Supplemental Security Income ("SSI"). (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **VACATED** and **REMANDED**, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this report and recommendation.  On remand, the ALJ should clearly articulate the rationale for her findings regarding the persuasiveness of the medical opinions and comply with SSR 96-8p's requirement that she explain any decisions not to adopt medical source opinions that conflict with the RFC.

---

[1] Under the authority of the Social Security Act, the Social Security Administration has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is 18 years old or older and has a disability that began before attaining age 22 (20 CFR 404.350(a)(5)).

## I.    Procedural History

On May 9, 2022, Mr. Whited filed applications for CIB and SSI, alleging a disability onset date of September 1, 2018.  (Tr. 68, 91.)  He later amended the alleged onset date to May 16, 2021.  (Tr. 44, 239.)  Mr. Whited alleged disability due to an intellectual disability, asthma, and attention deficit hyperactivity disorder ("ADHD").  (Tr. 69, 80.)  Mr. Whited's applications were denied at the initial level (Tr. 68, 91) and upon reconsideration (Tr. 92, 104), and he requested a hearing.  (Tr. 140.)  On November 9, 2023, a telephonic hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 40-67.)  On December 26, 2023, the ALJ issued a decision, finding Mr. Whited had not been under a disability within the meaning of the Social Security Act from May 16, 2021, through the date of the decision.  (Tr. 14-39.)  Mr. Whited sought review of the decision by the Appeals Council.  (Tr. 210-11.)  On November 19, 2024, the Appeals Council found no reason to review the decision, making the December 26, 2023 decision the final decision of the Commissioner.  (Tr. 1-6.)  On December 18, 2024, Mr. Whited filed a Complaint challenging the Commissioner's final decision denying his social security disability benefits.  (ECF Doc. 1.)  The matter is fully briefed.  (ECF Docs. 8, 10, & 11.)

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Mr. Whited was born in 2003 and was 18 years old on the amended alleged disability onset date, making him a younger individual under Social Security regulations on the alleged onset date.  (Tr. 80.)  He had at least a high school education.  (Tr. 249.)  Mr. Whited has not worked since September 1, 2018, the original alleged onset date.  (Tr. 80.)

**B.      Relevant Medical and Educational Evidence**

The ALJ found both mental and physical severe impairments.  (Tr. 20.)  However, Mr.

Whited challenges only the ALJ's mental RFC determination.  (ECF Doc. 8.)  Therefore, only

the records related to his mental health and intellectual disability will be summarized herein.

**1.      Education and Treatment Records**

**i.      Educational Records**

Mr. Whited received special education services from early childhood.  (Tr. 390.)  When

he was in high school, a repeat Evaluation Team Report ("ETR") and Individualized Education

Program ("IEP") were prepared by the Springfield Local School District.  (Tr. 342-401.)  The

ETR was completed on October 27, 2020.  (Tr. 373-401.)  At that time, Mr. Whited was in 11th

grade and participating in remote learning due to the COVID-19 pandemic.  (Tr. 374.)

The ETR documents Mr. Whited's prior cognitive testing, specifically the Wechsler

Preschool and Primary Scale Intelligence-Third Edition ("WPPSI-III") and Wechsler

Intelligence Scale for Children-Fourth Edition ("WISC-IV").  (Tr. 374-75.)  At age five, he

obtained a 75 verbal IQ, a 77 performance IQ, and a 72 full scale IQ ("FSIQ") on the WPPSI-III.

(Tr. 374.)  At age 8, he obtained a 61 verbal comprehension, a 77 working memory, and a 70

FSIQ on the WISC-IV.  (Tr. 374-375.)  This was deemed to fall in the borderline range of

cognitive functioning in the second percentile.  (Tr. 375.)

As part of the ETR, Mr. Whited underwent evaluation of his academic, social

emotional/adaptive, and communication skills.  (Tr. 377-85.)  A set of tests from the Woodcock-

Johnson IV Tests of Achievement Form A and Extended was administered remotely over two

days, and Mr. Whited scored between very low and low average in all academic areas.  (Tr. 377-

78.)  It was also noted that: he could read well, but he was not comprehending what he read; he had great difficulty with abstract reasoning; and he had poor writing fluency.  (Tr. 378.)

To evaluate Mr. Whited's social emotional/adaptive behavior, the Behavior Assessment for Children, Third Edition ("BASC-3") was administered on September 29, 2020.  (Tr. 380-83.) Mr. Whited's scores were based on his mother's rating of his behavior using the BASC-3 Parent Rating Scales form.  (Tr. 380.)  According to the ETR, "Scale scores in the Clinically Significant range suggest a high level of maladjustment. Scores in the At-Risk range may identify a significant problem that may not be severe enough to require formal treatment or may identify the potential of developing a problem that needs careful monitoring."  (*Id.*)  Mr. Whited's scale scores were "clinically significant" in the areas of attention problems and functional communication.  (Tr. 381.)  His scale scores were in the "at-risk range" in the areas of adaptive skills, social skills, leadership, activities of daily living, developmental social disorders, executive functioning, and resiliency.  (Tr. 381-82.)

Mr. Whited's communication skills were evaluated through informal and curriculum-based assessments, along with progress monitoring throughout the year.  (Tr. 384.)  The evaluator concluded that he had difficulty processing oral information and had deficits in vocabulary, problem solving, understanding language, and expressing his thoughts and ideas. (*Id.*)  His communication skills were "very low" compared to same-age peers.  (*Id.*)

The October 2020 ETR concluded that Mr. Whited remained eligible for special education services due to his intellectual disabilities.  (Tr. 390; *see id.* at 378-79, 382-83, 385.) The evaluation team summarized their findings as follows:

> Zachary needs a multimodality approach to teaching especially when new concepts are introduced. Zachary should receive instruction in the regular classroom along with specialized programming designed for his individual needs in the resource room. Performances demonstrate that learning new information may require more

4

> instruction, repetition, and reinforcement. Learning new information in school in large group settings at a rapid pace is more difficult for Zachary and is a less effective instructional method for him. Zachary is a student who would require specialized instruction across all academic areas. He would likely have difficulty with novel information and may need information presented in a multi-modal fashion.

(Tr. 389.)

An updated IEP was completed on September 21, 2021.  (Tr. 342-72.)  It states that Mr. Whited, during senior year of high school: often needed to be reminded to put in effort and check his work; did not always use available resources without reminders from the teacher; was good at memorizing but had trouble applying information; and was "very quiet" and did not socialize much with other students.  (Tr. 344.)  He received all instruction in the general education classroom except for math, for which he saw an Intervention Specialist for one period a day.  (*Id.*)  He also spent one period in the Resource Room to receive support from the Intervention Specialist.  (*Id.*)  He received accommodations in the form of frequent breaks and extended time to take tests and quizzes in a small group.  (Tr. 345.)

Mr. Whited had planned to attend a career center to study masonry but decided against it due to the COVID-19 pandemic.  (Tr. 344.)  Instead, he participated in a two-year Information Technology ("IT") Program at Maplewood Career Center, in which he learned to write computer software and work on PCs and notebook computers.  (Tr. 346.)  Mr. Whited stayed on task, worked well with peers, and followed all safety rules and procedures.  (*Id.*)  No major issues were reported with his participation in this program.  (*Id.*)

### ii. Treatment Records

On February 23, 2021, Mr. Whited attended an appointment with Paul Schuh, MD, at Akron Children's Hospital to follow up on his ADHD.  (Tr. 417-19.)  He was taking methylphenidate HCl 36 mg tablet once per day, with no side effects.  (Tr. 417.)  He had been

5

off his medication during vacation, on weekends, and during the summer, but he was otherwise compliant. (Tr. 418.) He reported improvement in symptoms of poor attention to detail, poor attention span, and easy distractibility. (*Id.*) Dr. Schuh continued Mr. Whited's medication, and recommended follow-up in three months. (Tr. 417.)

On May 25, 2021, Mr. Whited returned to see Dr. Schuh. (Tr. 419-20.) He was compliant with medication, meeting expectations in school, and had seen improvement in social relationships, decreased disruptive behavior, and improved academic performance. (Tr. 420.) Dr. Schuh continued Mr. Whited's medication and recommended follow-up in four to six months. (Tr. 419.)

Mr. Whited next saw Dr. Schuh for an ADHD follow-up on March 28, 2022. (Tr. 434-35.) He was doing well in school and continuing to see improvement in social relationships, decreased disruptive behavior, and improved academic performance. (Tr. 435.) His medication was continued, and he was instructed to follow up in six months. (*Id.*)

On January 30, 2023, Mr. Whited saw Dr. Schuh for an ADHD follow-up and well child visit. (Tr. 551-55.) He had been using his medication while working, but he was not then working and had been off his medication "for some time." (Tr. 552.) He did not request a refill. (*Id.*) His mother requested a referral to psychology "to be evaluated for disability." (*Id.*) Mr. Whited did not report depression, anxiety, or suicidal/homicidal ideations. (Tr. 553.) On a PHQ-9 depression screening, he indicated that he sometimes had problems concentrating on simple tasks like schoolwork, reading, or watching television. (Tr. 555.) However, he also indicated that these problems had not made it difficult to take care of things at home or get along with other people. (*Id.*)

On March 14, 2023, at Dr. Schuh's referral, Mr. Whited presented for a diagnostic assessment with Kimberly Bonnet at Coleman Professional Services.  (Tr. 630-43.)  His mother accompanied him and informed Ms. Bonnet that she wanted Mr. Whited assessed "for our own being and we're appealing his SSI."  (Tr. 630.)  She provided much of the information at the assessment.  (Tr. 630-31.)  She reported that Mr. Whited: sat in his room all the time; did not show emotion; became nervous around others; overthought things; clenched his fists, yelled, went to his room and slammed the door when angry; had to be told to do something three or four times before he understood it; and had "full conversations" with himself.  (*Id.*)  For his part, Mr. Whited reported that he: felt sad his father had recently died, but could not cry; felt nervous about getting a job; became frustrated and wanted to punch something but did not; had a hard time focusing on school; played videos games; and had a hard time sleeping due to pain.  (*Id.*)

Based on these reports, Ms. Bonnet found that Mr. Whited dealt with depressed mood, bereavement issues, anxiety, anger/aggression, inattention, and sleep problems.  (*Id.*)  During the assessment, Mr. Whited was cooperative and looked to his mother to answer questions for him.  (Tr. 634.)  He displayed average to avoidant eye contact, clear speech, congruent affect, concrete thought processes, and unremarkable thought content.  (*Id.*)  He and his mother reported focus issues.  (*Id.*)  Ms. Bonnet made relevant, provisional diagnoses of unspecified anxiety disorder and unspecified major depressive disorder, single episode.  (Tr. 640-41.)

On April 10, 2023, Mr. Whited presented to LaQuitta Alexander for counseling at Coleman Professional Services.  (Tr. 612-14.)  Ms. Alexander observed that he was distressed, worried, restless, lacking assertiveness, shy, depressed, and open.  (Tr. 612.)  He stated that he was looking for work with the help of an employment specialist and had a hearing on his pending disability claim.  (*Id.*)  He felt nervous about working and did not like working around a

lot of people.  (*Id.*)  At his next appointment on April 27, 2023, Mr. Whited said he had paused searching for a job because he had recently hurt his foot.  (Tr. 615.)  He was observed to be distressed, depressed, anxious, worried, and open.  (*Id.*)

Mr. Whited returned to see Ms. Alexander on May 11, 2023.  (Tr. 617-18.)  He was observed to be depressed, anxious, restless, nonchalant, and reluctant.  (Tr. 617.)  He reported continued discomfort in his foot and said he was taking a two-week break from looking for employment because of his upcoming disability hearing.  (*Id.*)  He reported some social anxiety and coping by watching television and playing games.  (*Id.*)  At his next appointment on May 26, Mr. Whited was still not looking for work due to his upcoming hearing, and Ms. Alexander observed that he was restless, anxious, nonchalant, and worried.  (Tr. 619.)

On June 15, 2023, Ms. Alexander noted that Mr. Whited presented as distressed, anxious, restless, and bored.  (Tr. 621.)  He reported having only one friend (*id.*), but he was working on his social skills and agreed to practice saying hello to people at the grocery store (Tr. 622).  On June 27, 2023, Mr. Whited's mother accompanied him to his counseling session, and Mr. Whited sought help completing an ability to work form.  (Tr. 623.)  He was continuing to practice greeting others.  (*Id.*)  Mr. Whited and Ms. Alexander discussed the time frame he would be willing to wait for benefits before looking for work again.  (Tr. 624.)

On July 13, 2023, Mr. Whited again asked Ms. Alexander for help completing some paperwork for his disability claim.  (Tr. 626.)  Ms. Alexander observed that he was distressed, anxious, worried, open, and overwhelmed.  (*Id.*)  They discussed how the pending disability application and employment challenges contributed to Mr. Whited's mood symptoms.  (Tr. 627.)  On July 27, 2023, Mr. Whited was noted to be restless, sluggish, unmotivated, and depressed.  (Tr. 628.)  He reported having no routine during the day other than spending occasional time

with family and a friend.  (*Id.*)  His hearing was still pending.  (*Id.*)  Ms. Alexander discussed coping skills such as getting fresh air and socialization.  (Tr. 629.)

At an ADHD follow-up with Dr. Schuh on July 31, 2023, Mr. Whited was still off his ADHD medication and stated that he was doing well.  (Tr. 600.)  He planned to restart methylphenidate when he found another job.  (*Id.*)  He and Dr. Schuh discussed the possibility of medication for social anxiety, and Mr. Whited said he would think about it.  (*Id.*)

Mr. Whited returned to counseling on August 11, 2023.  (Tr. 651-52.)  He presented as distressed, shy, restless, depressed, and reluctant.  (Tr. 651.)  He reported continued restlessness, loneliness, and social challenges.  (*Id.*)  Ms. Alexander helped him develop effective methods to reach out to and communicate with a friend about socializing and to identify questions he could ask to keep a conversation going.  (Tr. 652.)  On August 31, 2023, Mr. Whited was still anxious and worried but appeared motivated.  (Tr. 648.)  He had been assertive in meeting with a school friend, and it went very well.  (*Id.*)  He also reported feeling more comfortable greeting people. (*Id.*)  Ms. Alexander asked him about his dating habits and provided support related to communicating with others and building relationships.  (Tr. 649.)

The last counseling appointment in the record took place on September 22, 2023.  (Tr. 645-47.)  Ms. Alexander observed that Mr. Whited was restless, sluggish, depressed, and worried.  (Tr. 645.)  Mr. Whited said he wanted to learn how to drive, but he was afraid and did not plan on studying for the test until after his disability hearing.  (*Id.*)  Ms. Alexander helped him break down the driving study manual so it would be less overwhelming, but he was not fully engaged in this discussion.  (Tr. 646.)  Ms. Alexander also encouraged volunteer work to help increase Mr. Whited's socialization skills and alleviate boredom.  (*Id.*)  He expressed interest in volunteering at the zoo or an animal shelter.  (*Id.*)

2.      **Opinion Evidence**

i.      **Consultative Examiners**

a)  **Joshua Magleby, Ph.D., 2019 Opinion**

On September 23, 2019, Mr. Whited presented to clinical neuropsychologist Joshua Magleby, PhD for a consultative examination.  (Tr. 336-41.)  Dr. Magleby based his opinion on a 60-minute clinical interview, complete mental status examination of Mr. Whited, and the results of a Wechsler Adult Intelligence Scale-Fourth Edition ("WAIS-IV").  (Tr. 336.)

Mr. Whited easily separated from his mother for testing and evaluation.  (Tr. 337.)  Upon mental status examination, he was alert, "clearly well oriented," cooperative, quiet, and attentive. (*Id.*)  He made "fairly appropriate" eye contact, but engagement with the examiner was limited. (*Id.*)  His language and use of language appeared "fairly adequate" for age expectations and not markedly impaired in any way.  (*Id.*)  His attention and concentration functioning appeared adequate for age expectations, and there was no evidence of a marked impairment.  (*Id.*)

Mr. Whited could recall three of three objects after one minute, four digits forward, and three digits reversed.  (*Id.*)  He completed simple counting activities with some trouble counting by twos.  (*Id.*)  He read simple and complex words with some stammering.  (*Id.*)  He knew that Sunday came after Saturday, displayed adequate vigilance in listening and sustaining effort for a task, was not fidgety or overly impulsive, and responded at an appropriate pace for his age expectations.  (*Id.*)  There was no significant impairment in his ability to respond to simple directions.  (*Id.*)  His anxiety appeared to be within normal limits.  (*Id.*)  His fund of information was "fairly average," and his general intelligence "appeared low average to borderline."  (*Id.*)

Mr. Whited's reported daily routines were "relatively normal" for age and expectations. (*Id.*)  His communication and motor skills appeared "fairly age appropriate," his ability to

10

communicate needs to others appeared "fairly average," and his ability to get along with others seemed "fairly intact." (Tr. 339.) Mr. Whited's mother said he got up in the morning with prompting and could dress and care for his hygiene without assistance, but she needed to remind him daily. (*Id.*) Mr. Whited could generally organize his things without help but understanding time and money were "a little difficult." (*Id.*) Social skills and emotional and behavioral control seemed "at least adequate" for his age. (*Id.*)

Mr. Whited underwent WAIS-IV testing. (*Id.*) His effort on the test appeared fair and the results appeared to be valid and reliable. (*Id.*) Mr. Whited's FSIQ was 71 (third percentile), with a 72 verbal comprehension, 79 perceptual reasoning, 69 working memory, and 81 processing speed. (*Id.*) His intellectual functioning based on his FSIQ was classified in the "Borderline to Extremely Low Range of Intelligence" for his age. (*Id.*)

Dr. Magleby diagnosed Mr. Whited with: intellectual disability, mild; and ADHD, predominantly inattentive presentation, mild. (Tr. 340.) He opined that, relative to the functioning of typically developing children the same age: Mr. Whited's ability to acquire and use information was at least somewhat delayed; his ability to attend to tasks was not grossly impaired; his ability to interact and relate to others was mostly adequate; and his ability in the area of self-care was at least somewhat delayed. (Tr. 340.)

### b) Bryan J. Krabbe, Psy.D.

On November 4, 2021, Mr. Whited underwent a consultative psychological examination with Bryan Krabbe, Psy.D. (Tr. 402-07.) Dr. Krabbe conducted a clinical interview and reviewed unspecified background materials. (Tr. 402.) Mr. Whited reported that the nature of his disability was "mostly focusing" (Tr. 403) and endorsed symptoms of failing to give close attention to details, difficulty sustaining attention, not following through on instructions,

difficulty organizing tasks, avoiding tasks that require sustained mental effort, often losing necessary items, and being easily distracted/forgetful (Tr. 404).

Regarding the activities of daily living, Mr. Whited spent his time watching television. (Tr. 404.)  He could attend to his daily hygiene, perform household chores, shop for groceries, and prepare basic meals.  (*Id.*)  He had difficulty remembering appointments and medication and did not have a driver's license.  (*Id.*)  He had several friends outside his family.  (*Id.*)

During the evaluation, Mr. Whited was cooperative, his grooming/hygiene were adequate, he spoke with normal speed and displayed no loose associations or delusions, he could attend to simple instructions, his mood was euthymic, and he displayed no indications of anxiety. (Tr. 404-05.)  He understood the purpose of the examination, did not seem to exaggerate or minimize his difficulties, and put forth good effort completing tasks.  (Tr. 404.)

Upon examination, Mr. Whited was alert, responsive and fully oriented; he recalled five digits forward and three digits backward; he recalled three of three words after a brief delay and identified two of the past three presidents; he had no difficulty recalling his upbringing or following a conversation and responding to direct questions; he could count backwards from 100 by sevens for three iterations in 30 seconds with two errors and could count backwards from 20 by threes in 15 seconds with zero errors; he had some difficulty calculating division and fractions; he scored below average when asked to described similarities between two words; he explained that the saying "[w]hat goes around comes around," means, "[i]f something happens to you it can hit the person right back"; and he could not identify three cities in the world but knew that 60 seconds were in one minute.  (Tr. 405.)

Mr. Whited appeared to have adequate insight into his difficulties, and his judgment appeared sufficient to make decisions affecting his future and conduct his living arrangements.

12

(*Id.*)  His memory, math skills, intelligence, and functioning appeared adequate to manage funds. (Tr. 406.)  Dr. Krabbe concluded that Mr. Whited's general level of intelligence appeared to fall below normal limits (Tr. 405) and diagnosed him with unspecified ADHD (Tr. 406).

Dr. Krabbe provided a functional assessment of Mr. Whited's mental abilities in the four categories of mental functioning, as follows.  (Tr. 406-07.)  With respect to understanding, carrying out, and remembering instructions, he opined that Mr. Whited may have difficulties acquiring new information in work settings.  (Tr. 406.)  With respect to sustaining concentration, persistence, and pace, he opined that Mr. Whited demonstrated "some difficulty with attention and focus," "displayed adequate task persistence," and "displayed no indication of distraction during the evaluation."  (Tr. 406-07.)  With respect to maintaining effective social interaction with supervisors, co-workers, and the public on a consistent and independent basis, he opined that Mr. Whited "functioned within adequate limits of intellectual functioning to understand and respond to supervisor feedback and adequately relate to coworkers."  (Tr. 407.)  With respect to the ability to handle normal pressures in a competitive work setting, he opined that Mr. Whited did not describe symptoms that would compromise his ability to respond to work pressures.  (*Id.*)

### c)  Joshua Magleby, Ph.D., 2022 Opinion

On September 29, 2022, Mr. Whited underwent a second consultative examination with Dr. Magleby.  (Tr. 500-07.)  Dr. Magleby conducted a complete mental status examination and new psychological testing with the WAIS-IV, and reviewed his 2019 evaluation.  (Tr. 500.)

Mr. Whited described his problem as "it's hard for me to communicate with people, I can't spit the words out with people."  (*Id.*)  He reported that his ADHD continued but was "not as bad," and he took medication while in school that helped him focus.  (Tr. 501.)  Being around others made him uncomfortable as he thought people were talking about and judging him.  (*Id.*)

He could get up in the mornings and care for his own personal hygiene needs.  (Tr. 501-02.)  He could organize his living environment, communicate wants and needs, do laundry, and manage money to the extent of shopping, paying bills, and counting change.  (Tr. 502.)  He did not know how to cook and never learned how to schedule appointments for himself or use public transportation.  (*Id.*)  He needed assistance planning and completing basic daily activities.  (*Id.*)

Upon mental status examination, Mr. Whited was alert and fully oriented.  (*Id.*)  He made "fairly appropriate" eye contact, and his behavior was "generally composed and appropriate to the situation."  (*Id.*)  His thought content was linear, future oriented, and without loosening, irrationality, or confabulation.  (*Id.*)  He demonstrated an adequate ability to communicate and converse.  (*Id.*)  His speech was clear and of normal speed, though his production was "somewhat limited to short responses with few details."  (*Id.*)  His ability to comprehend simple language was "more than adequate," and his ability to understand more complex directions and language was adequate.  (*Id.*)  His affect was somewhat restricted and anxious and did not appear mood congruent.  (Tr. 503.)  His mood was stable, and he displayed overt signs of anxiety (nervous look on face and nervous movement with fingers).  (*Id.*)  There were no observed hallucinations, dissociative events, or delusions.  (*Id.*)  Mr. Whited's ability to respond to mental status inquiry and simple directions was "more than adequate," and his task engagement and effort were normal.  (*Id.*)  He repeated four digits forwards and two digits backward.  (*Id.*)  His ability to spell "world" backwards and his counting backwards from 20 were average.  (*Id.*)  Counting by threes was average and by serial sevens was poor.  (*Id.*)  He could recall three of three words immediately and after a delay.  (*Id.*)  He could name 28 animals in 60 seconds.  (*Id.*)  His simple computation skills were fair with one repetition needed and slowed.  (*Id.*)  His executive functions appeared "somewhat impaired," his literacy level appeared functional, and

his commonsense reasoning seemed "fairly adequate." (*Id.*)  He could interpret a simple

proverb, his general fund of information was poor, and his mental processing speed was

adequate. (*Id.*)  He showed "no clear signs of attentional deficits." (*Id.*)  Based on the exam, Dr.

Magleby opined that Mr. Whited's intelligence was extremely low. (*Id.*)

Mr. Whited underwent new WAIS-IV testing; his effort was fair and the results appeared

to be a valid and reliable measurement. (Tr. 504.)  His FSIQ was 70 (second percentile), his

verbal comprehension 72, perceptual reasoning 79, working memory 66, and processing speed

86. (*Id.*)  His intellectual functioning based on the FSIQ was classified in the "Extremely Low

Range of Intelligence" for his age. (*Id.*)

Dr. Magleby diagnosed Mr. Whited with: intellectual disability, mild; social anxiety

disorder; and unspecified ADHD. (*Id.*)  Although he acknowledged that Mr. Whited's FSIQ was

consistent with a borderline or extremely low intellect, Dr. Magleby indicated that variable index

scores (from low average to extremely low) suggested the FSIQ was "a less valid indicator of

overall intellectual functioning at this time." (Tr. 505.)  He also noted that Mr. Whited "claimed

longstanding trouble with focus," but that "no obvious signs of ADHD were observed and he did

not take his stimulant medication today." (Tr. 506.)

Dr. Magleby provided a functional assessment of Mr. Whited's mental abilities in the

four categories of mental functioning, as follows. (Tr. 506-07.)  With respect to understanding,

remembering, and carrying out simple oral instructions, he opined that Mr. Whited was "more

than adequate," with average comprehension and memory and a demonstrated ability to follow

questions, directions, and oral instructions. (Tr. 506.)  He further opined that Mr. Whited's

ability to follow more complex instructions appeared "more than adequate," but his ability to

learn novel academic-based skills had long been difficult based on his IEP. (*Id.*)  With respect to

maintaining concentration, persistence, and pace, he opined that Mr. Whited's abilities were adequate overall, but his ability to perform multi-step tasks appeared at least somewhat impaired. (*Id.*)  With respect to the ability to relate to others, he opined that Mr. Whited was somewhat impaired due to social anxiety disorder.  (*Id.*)  With respect to the ability to withstand the mental stress and pressures associated with day-to-day work, Mr. Whited was somewhat impaired, particularly in social situations.  (Tr. 507.)

ii.        **State Agency Psychological Consultants**

On November 1, 2022, state agency psychological consultant Robyn Murry-Hoffman, Psy.D., completed a mental RFC for Mr. Whited.  (Tr. 75-78, 86-89.)  Dr. Murry-Hoffman opined that Mr. Whited had the capacity to: understand and remember simple repetitive tasks; carry out simple repetitive tasks in a setting without demands for fact pace or high production or having to focus or concentrate for prolonged periods of time to complete tasks; engage in occasional, superficial, social interactions with coworkers, supervisors, and the public; and adapt to minor and infrequent changes to routine tasks.  (Tr. 75-76, 86-87.)  The last limitation was accompanied by the following statement: "it is noted that learning novel skills is problematic. He may need assistance in learning new tasks and time to transition to task changes."  (Tr. 76, 87.) On reconsideration on March 22, 2023, Audrey Todd, Ph.D., affirmed Dr. Murry-Hoffman's opinion as written.  (Tr. 99-102, 111-14.)

**C.**    **Function Reports**

**1.**    **Plaintiff's Mother's 2022 Function Report**

Mr. Whited's mother, Barbara Hunter, completed an Adult Function Report on his behalf on July 20, 2022.  (Tr. 255-63.)  Mr. Whited lived in a house with family.  (Tr. 255.)  He was

16

limited from working because sometimes it was hard for him to comprehend what he was asked to do, and he needed clarification or someone to show him what to do. (*Id.*)

On a typical day, Mr. Whited got up, took medicine, then returned to his room to watch television or play games. (Tr. 257.) He would get food, return to his room, nap, play more games, and watch more television. (*Id.*) After dinner, he returned to his room to watch television and play games before taking medicine and going to bed. (*Id.*) He did not take care of any other people or animals. (*Id.*) His conditions did not affect his sleep or his ability to care for personal hygiene. (*Id.*) He did not need reminders to care for personal grooming but did need reminders to take medication; his mother reminded him to take nightly medicine and sometimes morning medicine. (Tr. 258.) Mr. Whited never prepared meals and did not know how to cook. (*Id.*) He took out the trash once a week, and it took five to ten minutes. (*Id.*) He swept a couple times a week, taking 15-20 minutes, and tidied his room once a week, taking 5-10 minutes. (*Id.*) His mother had to encourage him to do his chores and make sure he did them properly. (*Id.*)

Mr. Whited went outside "when he [went] somewhere" and rode in the car. (Tr. 259.) He could go out alone, but he could not drive because he was frightened. (*Id.*) He went shopping with his mother once a week at the grocery store for 45 minutes to an hour. (*Id.*) He also shopped once or twice a month by mail for gift cards, Legos, and "starter shirts." (*Id.*) He was not able to pay bills, count change, handle a savings account, or use a checkbook/money order because it was hard for him to comprehend the numbers. (*Id.*)

Mr. Whited's hobbies included video games, Pokémon, and animals. (Tr. 260.) He went "back and forth with interests" and did "well." (*Id.*) He spent time with others on the phone, texting or video chatting, and went to dinner or to the movies "once in a great while" with others. (*Id.*) He did not have problems getting along with family, friends, or others. (*Id.*) Mr. Whited

17

did not go anywhere on a regular basis but stayed home most of the time.  (*Id.*)  He had to be reminded to go to doctor's appointments and needed someone to accompany him to translate what people said because he did not comprehend important things. (*Id.*)

Mr. Whited's conditions affected his abilities to walk, talk, remember, concentrate, and understand. (Tr. 261.)  He became short of breath when walking long distances; when he spoke fast, he became hard to understand due to a speech problem; he had a hard time remembering schedules and appointments; he had a hard time focusing on something; and he sometimes had difficulty understanding what others were saying.  (*Id.*)  Mr. Whited was right-handed.  (*Id.*)  His mother did not know how long he could walk before needing to stop and rest.  (*Id.*)  He finished what he started, needed help to understand written instructions, and could follow spoken instructions if they were repeated.  (*Id.*)  He got along with authority figures very well and had never been fired or laid off due to problems getting along with others.  (*Id.*)  He did not handle stress or change well, becoming upset and frustrated.  (Tr. 262.)  He wore prescribed corrective lenses when watching television or using the computer.  (*Id.*)  He took medications, but he did not experience any side effects.  (Tr. 263.)

### 2.    Plaintiff's 2023 Function Report

Mr. Whited completed an Adult Function Report on his own on March 3, 2023.  (Tr. 284-91.)  He still lived in a house with family.  (Tr. 284.)  He was not working because he had a hard time focusing and comprehending and had trouble with social skills.  (*Id.*)

On a typical day, Mr. Whited woke up, took his medicine, watched television or played games, ate, showered, and brushed his teeth.  (Tr. 285.)  He then watched more television and played games until dinner, after which he took medicine and went to bed.  (*Id.*)  He did not take care of any other people or animals.  (*Id.*)  He had no problems with personal care or hygiene

tasks.  (*Id.*)  He did not need special reminders to take care of personal needs or grooming but did need his mother to remind him to take medication.  (Tr. 286.)  He did not prepare his own meals because he did not know how to cook.  (*Id.*)  He could take out the trash weekly, tidy his room occasionally, and sometimes sweep; each task took a few minutes.  (*Id.*)  He needed help or encouragement to do these things.  (*Id.*)  With sweeping specifically, his mother had to remind him to go over every area.  (*Id.*)  Mr. Whited did not do yard work because the yard was big, and he had asthma.  (*Id.*)  His mother did most of the other housework.  (*Id.*)

Mr. Whited went out to go to the store and the doctor. (Tr. 287.)  He rode in the car.  (*Id.*) He did not drive because he did not have his driver's license and was too nervous to get it.  (*Id.*) He could not go out alone because he preferred if someone accompanied him.  (*Id.*)  He went grocery shopping at a store once a week for an hour and occasionally shopped for clothes and games online for a few minutes at a time.  (*Id.*)  He could not pay bills, count change, handle a savings account, or use a checkbook/money order.  (*Id.*)

Mr. Whited's hobbies and interests included watching television, playing games, and animals.  (Tr. 288.)  He did these things daily and did them "good."  (*Id.*)  He spent time with others by texting, video chat, and messaging on a gaming system.  (*Id.*)  He occasionally went to dinner or to the movies with others.  (*Id.*)  He did not go anywhere on a regular basis.  (*Id.*)  He needed to be reminded to go places and only went out once in a while.  (*Id.*)  He needed someone to accompany him because he was scared to be alone.  (*Id.*)  He did not have problems getting along with others.  (*Id.*)

Mr. Whited's conditions limited his ability to walk, talk, climb stairs, remember, concentrate, understand, and follow instructions. (Tr. 289.)  Walking and climbing stairs affected his asthma, he had a speech impediment, and his intellectual disability caused the other

19

identified limitations.  (*Id.*)  Mr. Whited was right-handed.  (*Id.*)  He could walk one mile before

needing to stop and rest for ten minutes.  (*Id.*)  He could pay attention "for the most part," but he

became distracted.  (*Id.*)  He did not follow written instructions well and could follow spoken

instructions with repetition.  (*Id.*)  He got along very well with authority figures and had never

been fired or laid off due to problems getting along with others.  (*Id.*)  Mr. Whited did not

handle stress well because he became frustrated and anxious.  (Tr. 290.)  He also did not handle

changes in routine well because he was used to the original way and change was confusing.  (*Id.*)

Mr. Whited wore prescribed corrective lenses for reading, watching television, and using

the computer.  (*Id.*)  He took medication and did not identify any side effects.  (Tr. 291.)  He

liked to spend most of his time in his room so as not to be around too many people.  (*Id.*)

**D.**     **Hearing Testimony**

**1.**     **Plaintiff's Testimony**

At the hearing on November 9, 2023, Mr. Whited responded to questioning by his

attorney and the ALJ.  (Tr. 40-67.)  The ALJ noted the amended alleged onset date of May 16,

2021, Mr. Whited's 18th birthday.  (Tr. 44.)  Mr. Whited lived in a house with his mother and

younger brother.  (Tr. 47.)  He did not know whether he received any benefits, such as Medicaid,

and thought his mother handled his paperwork for things like insurance.  (Tr. 48.)  He did not

have a driver's license.  (*Id.*)  He had not attempted to get one and had not studied for the test.

(*Id.*)  His mother drove him places.  (Tr. 48-49.)

Mr. Whited completed 12th grade and graduated from high school.  (Tr. 49.)  He had

taken special classes to help with his learning.  (*Id.*)  He did not have any vocational job training,

licenses, or certificates.  (*Id.*)  He had once worked at Goodwill as part of a summer program

rearranging clothes and donations.  (*Id.*)  He had liked the job and earned about $700.  (*Id.*)  He

had done no other work for pay.  (*Id.*)  He had not tried to find another job or participate in any

other training programs.  (Tr. 49-50.)  He had done no volunteer work.  (Tr. 53-54.)

Mr. Whited said he was unable to work because it was hard to understand tasks that were

given to him.  (Tr. 50.)  While working at Goodwill, he would forget where he was told to put

the clothes and had to ask his job coach.  (*Id.*)  He had needed a job coach because it was hard

for him to know a task unless it was repeated to him.  (Tr. 55.)  The coach was with him the

whole time he worked at Goodwill.  (Tr. 56.)  Additionally, Mr. Whited's mother worked at

Goodwill and had helped arrange the job for him.  (*Id.*)

Mr. Whited could wash dishes at home, but he needed to ask for clarification of what

could go in the garbage disposal.  (Tr. 50-51.)  He also did laundry, cleaned his room, and

sprayed and dusted shelves.  (Tr. 51.)  He could not cook on the stovetop or in the oven, but he

could use the microwave.  (Tr. 51-52.)  He did not go shopping at the store alone and did not

think he would be able to do so.  (Tr. 52.)  Counting change was hard for him.  (*Id.*)  His mother

helped him with mail because he did not understand big words.  (Tr. 57.)  She also took him

places and made appointments for him.  (*Id.*)

On a typical day, Mr. Whited spent most of the time in his room.  (Tr. 52.)  He watched

television and played video games by himself or with his brother.  (Tr. 53.)  He had one friend

from school who he texted, and his older brothers took him out sometimes.  (*Id.*)

Summit County Developmental Disabilities Board ("Summit DD") was helping Mr.

Whited look for jobs that would probably allow a job coach.  (Tr. 56.)  They helped him apply,

write resumes, and other tasks associated with job searching.  (*Id.*)  Without their help, he would

not know how to make a resume.  (*Id.*)  Through Summit DD, Mr. Whited had applied at animal

shelters and stores like Target.  (*Id.*)  If he were to be hired by a place like Target, he would need a job coach to help him know where to put items or how to use the cash register.  (Tr. 57.)

Mr. Whited was attending counseling.  (Tr. 57.)  His counselor was going to help him prepare to link up with a friend to do things.  (*Id.*)  Mr. Whited needed help with this because he had social anxiety, and it was hard for him to talk to people or be in large crowds.  (Tr. 58.)  His counselor would walk him through how to text someone and how to start a conversation.  (*Id.*)  They also were helping him learn how to greet people and how to start a dating relationship.  (*Id.*)  Mr. Whited had not had any luck in that area yet, but he was working on it.  (*Id.*)

### 2.    **Vocational Expert's Testimony**

A Vocational Expert ("VE") testified that a hypothetical individual of Plaintiff's age, education, and work experience, with the functional limitations described in the RFC adopted by the ALJ could perform representative positions in the national economy at the medium exertional level, including store laborer, laundry worker, and linen attendant.  (Tr. 60.)  A hypothetical individual with the same functional limitations who was limited to light exertional jobs could perform representative positions in the national economy, including marker, routing clerk, and mail clerk.  (Tr. 61-62.)  If either hypothetical required the individual to avoid concentrated exposure to loud noise and lighting greater than the typical office environment, the VE testified that it would not change her testimony.  (Tr. 62.)

If an additional limitation was added to the hypothetical, providing that the individual "may need assistance in learning new tasks and time to transition to task changes," the VE testified "that's going to be an accommodation" and would preclude competitive work.  (Tr. 63.)  The ALJ noted that the language for this hypothetical came from the state agency psychological examiner's MRFC and was "very vague"—in particular, it did not specify the "level of

22

assistance and time" or "[h]ow much time to transition"—and asked the VE to "shed light on that vagueness" by explaining "what acceptability would be for an additional assistance in learning new tasks and transition time or task changes[.]"  (*Id.*)  For unskilled work, the VE explained that: (1) additional assistance could be provided during a "probation or training period"; and (2) after the training period, the individual would be expected to learn tasks and perform work "after being instructed . . . once or twice or demonstrated once or twice."  (Tr. 63-64.)  If additional assistance was needed beyond that level of instruction, including repetitive assistance or ongoing reminders, the VE testified "that's an accommodation."  (*Id.*)  The ALJ again noted that the phrase was vague, but explained that she looked to the VE as an expert to "interpret."  (Tr. 64.)  She noted that she had "wanted to discuss the phrases" and commented: "It does sound like they're kind of suggesting an additional power something."  (*Id.*)  The VE responded: "That's how I understood that as well, Your Honor."  (*Id.*)  The VE noted that her opinion regarding this language was based on her "training, education, and experience."  (Tr. 64-65.)

The VE also testified that it would preclude competitive employment if the individual would be off task more than 9% of the time, needed breaks beyond 15 minutes in the morning and afternoon with 30-60 minutes for lunch, or would be absent more than two days a month. (Tr. 65.)  Being absent once per month for three to six consecutive months would also be work preclusive and little to no absences were tolerated during training or probationary periods.  (*Id.*)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform other work available in the national economy. *Id.*

24

With respect to CIB, an adult whose parent is entitled to old age or disability benefits can receive CIB if the "child was under a disability . . . at the time he attained the age of 18 or . . . or prior to the time he attained . . . the age of 22."  42 U.S.C. § 402(d)(1)(G); *see* 20 C.F.R. § 404.350(a)(5); *Jones v. Sec'y of Health & Human Servs.*, 896 F.2d 553, at n.1 (6th Cir. 1990) (Section 402(d) "provides that a child of an individual entitled to old age or disability insurance benefits is entitled to [CIB] if he is under a disability (as defined by section 223(d) of the Social Security Act) which began before his twenty-second birthday."

## IV.    The ALJ's Decision

In his December 26, 2023 decision, the ALJ made the following findings:[2]

1.    Born on May 16, 2023, the claimant had not attained age 22 as of May 16, 2021, the amended alleged onset date.  (Tr. 20.)

2.    The claimant has not engaged in substantial gainful activity since May 16, 2021, the alleged onset date.  (*Id.*)

3.    The claimant has the following severe impairments: intellectual disorder, social anxiety disorder, unspecified ADHD, and asthma.  (*Id.*)

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 21.)

5.    The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: He can occasionally climb ladders, ropes, and scaffolds. He should avoid concentrated exposure to fumes, odors, dust, gases, and poor ventilation. He should avoid concentrated exposure to loud noise and lighting brighter than the typical office environment. He can understand, remember, and carry out simple instructions. He can have occasional interaction with supervisors, coworkers, and the general public. He cannot perform work that requires a specific production rate such as assembly line work or work that requires hourly quotas. He can deal with occasional changes in a routine work setting.  (Tr. 22.)

6.    The claimant has no past relevant work.  (Tr. 31.)

---

[2] The ALJ's findings are summarized.

7.      The claimant was born on May 16, 2003 and was 18-years-old, defined as a younger individual age 18-49, on the amended alleged disability onset date.  (*Id.*)

8.      The claimant has at least a high school education.  (*Id.*)

9.      Transferability of job skills is not an issue because the claimant has no past relevant work.  (*Id.*)

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including marker, routing clerk, and mail clerk.  (Tr. 32.)

Based on the foregoing, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from May 16, 2021, through the date of the decision on December 26, 2023.  (Tr. 33.)

## V.      Plaintiff's Arguments

In his first assignment of error, Plaintiff argues that the ALJ did not articulate valid reasons for rejecting specific portions of the state agency psychological consultant opinions. (ECF Doc. 8, pp. 14-20.)  In his second assignment of error, he argues that the ALJ did not articulate valid reasons for finding that Plaintiff's subjective symptoms were not entirely consistent with the medical evidence and other evidence.  (*Id.* at pp. 20-25).

## VI.      Law & Analysis

## A.      Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ

applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## B.   First Assignment of Error: The ALJ Did Not Adequately Explain Her Evaluation of the State Agency Psychological Consultants' Opinions Pursuant to SSR 96-8p

In his first assignment of error, Mr. Whited argues that the ALJ erred by failing to build "an accurate and logical bridge" between her finding that the state agency psychological consultant opinions were only partially persuasive and the factors she cited when making this finding.  (ECF Doc. 8, p. 15.)  Specifically, Plaintiff argues that the ALJ erred by failing to adequately explain why she did not adopt the state agency psychological consultants' statement that Mr. Whited "may need assistance in learning new tasks and time to transition to task changes."  (*Id.* at pp. 15-20; *see* Tr. 77, 87.)  The Commissioner responds that the ALJ was not required to adopt an opinion that Plaintiff "may" need certain limitations, the ALJ adequately explained why she did not include the cited limitation, and her findings are supported by substantial evidence.  (ECF Doc. 10, pp. 8-11.)  Plaintiff makes several arguments in reply, including that the cases cited by the Commissioner are distinguishable.  (ECF Doc. 11, pp. 1-7.)

### 1.   Framework for Evaluation of Medical Opinion Evidence

The Social Security Administration's ("SSA") regulations for evaluating medical opinion evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation.  20 C.F.R. § 404.1520c(a); *see Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). The five factors to be considered are supportability, consistency, relationship with the claimant, specialization, and other factors.  20 C.F.R. §§ 404.1520c(c)(1)-(5).  The most important factors

28

are supportability and consistency.  20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2).  ALJs must explain how they considered consistency and supportability but need not explain how they considered the other factors.  20 C.F.R. § 404.1520c(b)(2).

In reviewing an ALJ's medical opinion analysis, courts must consider whether the ALJ: considered the full record in assessing the persuasiveness of the opinion; appropriately articulated his reasons for finding the opinion unpersuasive; and made findings supported by substantial evidence.  *See* 20 C.F.R. § 404.1520c (governing how ALJs consider and articulate findings re: medical opinions); 20 C.F.R. § 404.1520(e) (findings re: RFCs will be "based on all the relevant medical and other evidence" in the case record); *see also Blakley*, 581 F.3d at 405.

### 2. The ALJ Did Not Adequately Explain Her Evaluation of the State Agency Psychological Consultant Opinions Pursuant to SSR 96-8p

The ALJ provided the following analysis in support of her finding that the medical opinions of the state agency psychological consultants were partially persuasive:

> Robyn Murry-Hoffman, PsyD reviewed the record for the State Agency at the initial level. She endorsed moderate limits in each of the paragraph B criteria and opined the paragraph C criteria were not met. She opined the claimant can understand, remember, and carry out simple repetitive tasks in settings without demands for fast pace or high production or having to focus and concentrate for prolonged periods of time to complete tasks. The claimant is capable of occasional superficial social interactions with coworkers, supervisors, and the public. He can adapt to minor and infrequent changes to routine tasks, but it is noted that learning novel skills is problematic. He may need assistance in learning new tasks and time to transition to task changes []. Audrey Todd, PhD agreed at the reconsideration level []. These opinions are partially persuasive and supportable. The undersigned concurs in the paragraph B and C opinions. However, the record at the hearing level supports some changes to specific limitations in each of these domains. The undersigned finds that the totality of the evidence including a good response to conservative medication visits, no side effects of medication, not taking available medications, a few months of counseling, education records, IQ testing, work in a summer program, mental status exams, daily activities and the generally infrequent care are more consistent with the mental residual functional capacity [as stated].

29

(Tr. 28 (citations omitted) (emphasis added).)  Based on these findings, the ALJ concluded that

Mr. Whited had the following mental RFC:

> He can understand, remember and carry out simple instructions. He can have
> occasional interaction supervisors, coworkers and the general public. He cannot
> perform work that requires a specific production rate such as assembly line work
> or work that requires hourly quotas. He can deal with occasional changes in a
> routine work setting.

(Tr. 22.)  The RFC did not make any provisions for "assistance in learning new tasks" or "time to

transition to task changes."

Mr. Whited argues that the ALJ erred in analyzing the persuasiveness of the state agency

psychological opinions because she "rejected th[e] disabling portion of" those opinions—

specifically, the opinion that Mr. Whited "may need assistance in learning new tasks and time to

transition to task changes" (Tr. 77)—without adequately explaining why the factors she lists in

her analysis "warrant[] eliminating the disabling part of these expert source opinions."  (ECF

Doc. 8, p. 15 (citing Tr. 28-29).)  His characterization of the relevant limitations as "disabling" is

based on the VE's testimony that such limitations would be an "accommodation" that would

preclude competitive work.  (*Id.* (citing Tr. 63, 77, 100).)  Because the ALJ's explanation for

excluding the relevant limitation was inadequate, Mr. Whited argues the ALJ failed to build an

"accurate and logical bridge" between the factors listed in her analysis and her conclusion.  (*Id.*)

As a general matter, an ALJ "is not required to recite the medical opinion of a physician

verbatim in [her] residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x

149, 157 (6th Cir. 2009).  Indeed, even where an opinion was given great weight under prior

regulations, "there [was] no requirement that [the] ALJ adopt a state agency psychologist's

opinions verbatim; nor [was] the ALJ required to adopt the state agency psychologist's

limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015).

Nevertheless, Social Security Ruling 96-8p requires the ALJ to consider all medical opinions in her RFC assessment and, where her assessment "conflicts with an opinion from a medical source," she "must explain why the opinion was not adopted." SSR 96–8p, *Assessing Residual Functional Capacity in Initial Claims*, 61 Fed. Reg. 34474, 34478 (July 2, 1996); *see Fleischer*, 774 F. Supp. 2d at 881 (citing SSR 96-8p).  Further, where it has been shown that "SSA fail[ed] to follow its own regulations," the Sixth Circuit has explained that the "decision of the Commissioner will not be upheld" if the "error prejudices a claimant on the merits or deprives the claimant of a substantial right."  *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746 (citing *Wilson*, 378 F.3d at 546–47)) (internal quotation marks omitted).

While Plaintiff does not specifically cite to SSR 96-8p, he argues (consistent with that SSR) that the ALJ failed to adequately explain why her RFC conflicts with the state agency medical opinions.  (*Id.* at pp. 15-20.)  In assessing whether the ALJ erred under SSR 96-8p, the questions this Court must consider include the following: (1) whether the RFC conflicts with the specified limitation, so that the ALJ must explain why she adopted a conflicting limitation under SSR 96-8p; (2) if so, whether the ALJ adequately explained why she did not adopt the relevant limitation; and (3) if not, whether the ALJ's failure to comply with SSR 96-8p prejudiced Mr. Whited on the merits or deprived him of a substantial right under *Rabbers*, 582 F.3d at 651.

The Commissioner argues that this Court need not consider whether the ALJ adequately explained her reasons for excluding the relevant limitations from the RFC because "[t]his Court has repeatedly held that a statement from a medical source that a claimant 'may' have certain limitations does not qualify as a 'medical opinion' pursuant to 20 C.F.R. § 416.913(a)(2)."  (ECF Doc. 10, p. 9 (citing *Fuller v. Comm'r of Soc. Sec. Admin.*, No. 1:20-CV-611, 2021 WL 463145, at *12 (N.D. Ohio Feb. 9, 2021); *Nolcox v. Berryhill*, No. 1:17-CV-02655, 2019 WL 1331582, at

*10 (N.D. Ohio Mar. 25, 2019); *Slivka v. Berryhill*, No. 1:17-CV-01076, 2018 WL 3340388, at *8-9 (N.D. Ohio May 29, 2018), report and recommendation adopted, No. 1:17-CV-1076, 2018 WL 3336461 (N.D. Ohio July 5, 2018)).) But Mr. Whited responds that "none of the cases that the Defendant cites . . . find that a medical opinion is no longer a medical opinion if the word 'may' is used." (ECF Doc. 11, p. 2.) The undersigned agrees that it is an overstatement to say that courts in this district have "repeatedly held" that a medical source statement using an equivocal word like "may" cannot qualify as a "medical opinion" under applicable regulations.

A "medical opinion" is defined as "a statement from a medical source about what [a plaintiff] can still do despite [his] impairment(s) and whether [he] ha[s] one or more impairment-related limitations or restrictions" in abilities like "perform[ing] mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting." 20 C.F.R. § 404.1513(a)(2)(ii). In applying this definition, courts have recognized that the "vagueness of a medical opinion is a proper basis on which to afford it less weight." *See, e.g., Ackles v. Comm'r of Soc. Sec.*, 470 F. Supp. 3d 744, 747 (N.D. Ohio 2020) (citing *Gaskin v. Comm'r of Soc. Sec.*, 280 F. App'x 472, 476 (6th Cir. 2008)). But it is one thing to afford an opinion less weight because it is vague, and it is another thing entirely to find that the relevant limitation is so vague or equivocal that it is not a "medical opinion" at all.

In *Slivka*, the court rejected an argument that the ALJ erred by not adopting an RFC *requiring* "occasional rest breaks or opportunities for task reminders" when the underlying medical opinion stated only that the plaintiff "*may* require occasional rest breaks or opportunities for task reminders." 2018 WL 3340388, at *8 (emphasis in original). The court found "nothing unreasonable or insufficient" in the ALJ's failure to "expressly state that he was rejecting this so-

called opinion concerning breaks and reminders," explaining that it found "no reversible error stemming from an ALJ's omission of such an equivocal statement."  *Id.* at *8-9.  Explaining further, the court said: "While it would have been preferable for the ALJ to address specifically why such breaks were not incorporated into the RFC, '[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is a reason to believe that remand might lead to a different result.'"  *Id.* at *9 (citations omitted).  Thus, rather than explicitly finding that the language in question did not meet regulatory standards to qualify as a "medical opinion," the *Slivka* court found instead that there was no reversible error because the court had no reason to believe that a "remand might lead to a different result."  *Id.*

The court in *Nolcox* addressed a similar medical opinion, i.e., an opinion that the plaintiff "may require occasional flexibility for shifts and breaks," but the ALJ in *Nolcox* did not fail to explain why he excluded the relevant limitation from the RFC; instead, he explicitly gave that portion of the medical opinion "little weight" because it was "vague and unsupported by the record" and further explained that the VE had "testified that some flexibility for shifts and breaks is allowed in most competitive employment[.]"  2019 WL 1331582, at *9.  In that context, the court held that the ALJ had adequately explained why "one of the so-called 'limitations' . . . was only partially adopted and incorporated into the RFC."  *Id.* at *10.  The court further observed that the plaintiff had "ignore[d] the equivocal nature of the opinion in question" by inaccurately portraying the opinion "as an affirmative finding that Plaintiff *will* require occasional flexibility for shifts and breaks" when the language stated only that "Plaintiff '*may* require occasional flexibility for shifts and breaks[.]'"  *Id.* (emphasis in original).  Again, the court made no explicit finding that the use of equivocal language meant that the statement was not a "medical opinion."

Finally, in *Fuller*, the court held that an ALJ did not err by failing to include an RFC limitation stating that she "may need occasional flexibility with breaks when experiencing increased symptoms," since the ALJ was not required to adopt the relevant medical opinion verbatim and "the opinion states that Fuller may need occasional flexibility, not that such flexibility is mandatory."  2021 WL 463145, at *12 (citing *Nolcox* and *Slivka*).  The court did not address the adequacy of the ALJ's explanation for excluding the limitation, and certainly did not explicitly find that the relevant language was not a "medical opinion" under the regulations. Having reviewed the cases cited by the Commissioner, the undersigned agrees with Plaintiff that those cases do not "find that a medical opinion is no longer a medical opinion if the word 'may' is used."  (ECF Doc. 11, p. 2.)

Under the regulations, a "medical opinion" includes a statement from a medical source about whether Mr. Whited "ha[s] one or more impairment-related limitations or restrictions" in abilities like "perform[ing] mental demands of work activities."  20 C.F.R. § 404.1513(a)(2)(ii). Here, the state agency psychological consultants noted that it is "problematic" for Mr. Whited to "learn[] novel skills" and opined that he "may need assistance in learning new tasks and time to transition to task changes."  (Tr. 77.)  Although the ALJ accurately observed at Mr. Whited's hearing that the state agency consultants' language is "very vague," e.g., as to the level of assistance needed and amount of time needed to transition, she also asked the VE to "shed additional light on that vagueness" by explaining "what acceptability would be for an additional assistance in learning new tasks and transition times or task changes[.]"  (Tr. 63.)  After the VE explained that unskilled work would only allow for instructions or a demonstration of a new task "once or twice" after an initial probationary or training period, and that any further instructions or reminders would be "an accommodation," the ALJ commented that the relevant opinion

language "[d]oes sound like they're kind of suggesting an additional power something," and the VE agreed. (Tr. 63-64.) Although the ALJ's meaning is not entirely clear, these comments may be read as an agreement that the opinion language is suggestive of additional limitations (i.e., beyond the unskilled work requirements that had just been discussed). In the context of the ALJ's questions and the VE's clarifying answers, the undersigned concludes that the state agency consultants' opinion that Mr. Whited "may need assistance in learning new tasks and time to transition to task changes" sufficiently describes "impairment-related limitations or restrictions" to constitute a medical opinion under 20 C.F.R. § 404.1513(a)(2)(ii).

Given the VE's testimony—based on her own understanding of the relevant opinion language and her "training, education, and experience"—that the described limitation would require "an accommodation" and would therefore be "work preclusive" (Tr. 63-64), and the ALJ's adoption of an RFC that did not include that opinion language or any other limitations relating to a need for assistance in learning new tasks or time to transition to task changes (Tr. 22), the undersigned concludes that the ALJ adopted an RFC that conflicted with a portion of the state agency medical opinions. Accordingly, the requirements of SSR 96-8p apply.

Turning to the second question in an SSR 96-8p analysis, whether the ALJ adequately explained why she did not adopt the relevant limitation, the Commissioner argues that the ALJ adequately explained her analysis when she found "the totality of the evidence including a good response to conservative medication visits, no side effects of medication, not taking available medications, a few months of counseling, education records, IQ testing, work in a summer program, mental status exams, daily activities and the generally infrequent care are more consistent with the mental residual functional capacity" she adopted. (Tr. 28; *see* ECF Doc. 10, p. 10.) But Mr. Whited argues that many of the factors listed by the ALJ are irrelevant to his

35

primary impairment, intellectual disorder, such as his use of and response to medication, his medication and counseling visits, and his "generally infrequent care."  (ECF Doc. 8, pp. 15-16.) Further, as to his education records, IQ testing, work in a summer program, mental status findings, and daily activities, Mr. Whited argues that his IEP records, intellectual testing, limited summer work with a job coach, mental status findings consistent with cognitive limitations, and limited reported daily activities are consistent with the state agency consultants' opinion that he "may need assistance in learning new tasks and time to transition to task changes," and that the ALJ failed to explain how the records support the exclusion of that limitation.  (*Id.* at pp. 16-19.) In response, the Commissioner highlights certain normal mental status findings and observes that Mr. Whited "was diagnosed with only mild intellectual disability and mild ADHD and 'evidence of diminished capacity was unremarkable.'"  (ECF Doc. 10, p. 10 (citations omitted).)

The undersigned agrees that the ALJ's generalized list of categories of information she considered, without further elucidation, does not provide a clear explanation as to why she did not adopt the state agency consultants' opinion that Mr. Whited "may need assistance in learning new tasks and time to transition to task changes" in the mental RFC.  As Mr. Whited argues, records relating to medication management and psychiatric treatment are of limited value in assessing the impact of an intellectual disability, and do not appear to have much relevance to the limitations at issue here.  Further, both the IEP records and the more recent intellectual testing records suggest that Plaintiff has notable limitations stemming from his intellectual disability. While the Commissioner characterizes his intellectual disability as "only mild," Mr. Whited's diagnosis of mild intellectual disability is based on reliable psychological testing that places him in the "Extremely Low Range of Intelligence" and in the 2nd percentile compared to his peers.

(Tr. 504.)  The clinical use of the term "mild" in his diagnosis is clearly not synonymous with "mild" limitations in the colloquial sense.

A review of the ALJ's earlier, detailed summary of the education, psychiatric treatment, and clinical testing records does not help to elucidate her reasons for citing those records in support of her opinion analysis, at least with respect to the opinion language at issue.  (*See* Tr. 24-28.)  While the ALJ finds Mr. Whited "can deal with occasional changes in a routine work setting, due to his reports that he has difficulty adjusting to change and his IQ scores" (Tr. 28), she does not explain why she concluded that he did not have additional limitations in learning new tasks or transitioning to task changes, consistent with the state agency opinions.

The ALJ's comments during the telephonic hearing also do not account for SSR 96-8p's requirement that she explain her decision not to incorporate the conflicting opinion limitations. Although the ALJ initially remarked that the language of the opinion was "very vague," she then asked the VE to provide expert testimony to "shed light on that vagueness" and made comments that raise a question as to whether she interpreted the opinion language as calling for "additional" assistance beyond what the VE testified was available in unskilled work.  (Tr. 63-64.)  Certainly, the VE interpreted the language as requiring an accommodation.  (*Id.*)

Considering the record as a whole, the undersigned cannot find that the ALJ complied with the requirements of SSR 96-8p, since she did not explain why she did not incorporate limitations consistent with the relevant state agency opinion in the RFC.  While the hearing transcript suggests that the ALJ had concerns that the language was vague, she explicitly sought expert testimony to "shed light on that vagueness" (Tr. 63-64) and did not ultimately state in her written decision that the relevant limitations were excluded because they were vague (Tr. 28-29). And while she cited generally to the evidentiary record in support of her RFC, she did not offer

37

explanation sufficient to make it clear to Mr. Whited or this Court why she excluded the relevant limitations from the RFC.  (*Id.*)  Did she conclude that the limitations were too vague to be reasonably included in the RFC?  Did she decide based on findings in the evidentiary record that the limitations were not consistent with Mr. Whited's level of intellectual functioning?  Or did she have another reason entirely for excluding the limitations?  The answer is not clear from the ALJ's written decision, and the undersigned accordingly concludes that the ALJ did not comply with the requirements of SSR 96-8p when she failed to explain her decision not to incorporate these relevant limitations in the RFC.  *See, e.g., Kinney v. Comm'r of Soc. Sec.*, No. 23-3889, 2024 WL 2273365, at *3 (6th Cir. May 20, 2024).

The final question before this Court is therefore whether the ALJ's failure to follow the requirements of SSR 96-8p in this instance prejudiced Mr. Whited on the merits or deprived him of a substantial right.  *See Rabbers*, 582 F.3d at 651.  Here, the ALJ questioned the VE regarding an additional RFC limitation that "the individual may need assistance in learning new task and time to transition to task changes," and the VE answered: "in my opinion, that's going to be an accommodation so that is not competitive work and is work preclusive as a result."  (Tr. 63.) Although the VE gave additional testimony detailing the level of assistance in learning new tasks that would be available without accommodation in an unskilled job, she did not change her opinion that the described limitation would require an accommodation.  (Tr. 63-64.)  Thus, the VE testified that an RFC limitation parallel to the one set forth in the state agency psychological opinions would preclude competitive work.  This suggests that Mr. Whited was prejudiced on the merits when the ALJ did not adopt some form of that limitation into the RFC.

The fact that SSR 96-8p only required an explanation for the ALJ's decision not to adopt the limitation, instead of requiring the ALJ to adopt the limitation, does not change this analysis.

"In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010).  As the Sixth Circuit explained in *Kinney*, the ALJ's finding that the state agency opinions were partially persuasive without explaining why she did not include assistance in learning new tasks and/or time to transition to task changes in the RFC left this court with "no way . . . to know if the RFC accurately portrayed [Mr. Whited]'s impairments and whether the VE's opinion reflected [his] true employability." *Kinney*, 2024 WL 2273365, at *4.  Although the ALJ was not required to incorporate the relevant limitation into the RFC, the undersigned concludes that her "failure to do so without explaining its omission warrants reversal." *Id.*

For the reasons set forth above, the undersigned was unable to meaningfully review the ALJ's decision to determine whether it was supported by substantial evidence because the ALJ failed to sufficiently explain—as required by SSR 96-8p—why she did not provide for assistance in learning new tasks and/or time to transition to task changes in the RFC, as contemplated in the state agency psychological opinions.  Accordingly, the undersigned recommends that the Court remand the decision for further proceedings consistent with this report and recommendation.[3]

---

[3] Because the undersigned recommends remand under the first assignment of error, the second assignment of error is not addressed herein.

## VII.  Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be **VACATED** and **REMANDED**, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this report and recommendation.  On remand, the ALJ should clearly articulate the rationale for her findings regarding the persuasiveness of the medical opinions and comply with SSR 96-8p's requirement that she explain any decisions not to adopt medical source opinions that conflict with the RFC.

November 24, 2025

*/s/Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).